# EXHIBIT A

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

---------------------------------------------------------x
MARINE ENVIRONMENTAL
REMEDIATION GROUP LLC and
MER GROUP PUERTO RICO LLC,

               Plaintiffs,

  vs.

TRAVELERS PROPERTY CASUALTY
COMPANY OF AMERICA,

               Defendant.
---------------------------------------------------------x

CIVIL NUMBER:

18-1179 (PAD)

CONCERNING:
INSURANCE CLAIM

Trial by Jury Demanded

**AMENDED COMPLAINT**

TO THE HONORABLE COURT:

    Plaintiffs Marine Environmental Remediation Group LLC ("MERG") and its wholly owned subsidiary, MER Group Puerto Rico LLC ("MER PR") (collectively, "MER"), by and through their attorneys, as and for their Amended Complaint against Defendant Travelers Property Casualty Company of America ("Travelers"), allege upon information and belief as follows:

**THE PARTIES**

    1.    Plaintiff MERG is a New Jersey limited liability company with its registered office located at 12 Hillcrest Road, Mountain Lakes, NJ 07046.

    2.    Plaintiff MER PR is a Puerto Rico limited liability company with its registration number 353957 and with its principal place of business located at Pier 3 Roosevelt Roads, Ceiba, PR 00735.

3.      Defendant Travelers is a Connecticut corporation with its principal place of business located at One Tower Square, Hartford CT 06183.

## JURISDICTION AND VENUE

4.      This Court has diversity of citizenship jurisdiction over the instant action pursuant to 28 U.S.C. §§ 1332(a)(1) and (2) because the action is between citizens of different States or foreign states, and the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs.

5.      Plaintiff MER is a Puerto Rico limited liability company whose sole member is Plaintiff MERG, a New Jersey limited liability company. MERG's members are Lawrence J. Kahn, a citizen of New Jersey, and Maritime Equities LLC, a Delaware limited liability company. Maritime Equities LLC's members are Sal Rusi, a citizen of New York, and Fundway LLC, a Kosovo limited liability company. Fundway LLC's members are Akan Ismaili, a citizen of Kosovo, and Bujar Musa, a citizen of Kosovo.

6.      Travelers is a Connecticut corporation with its principal place of business located in Connecticut.

7.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and (c), because this case involves an insurance dispute that originated in Puerto Rico, where the events giving rise to the claim occurred, and where the property that is the subject of the action was located. Travelers is a corporation that conducts regular, continuous, and substantial business in Puerto Rico. Travelers is also engaged in selling and facilitating the sale of insurance policies to residents of Puerto Rico, insuring risks in Puerto Rico, and handling claims in Puerto Rico, and is subject to this Court's personal jurisdiction with respect to this action.

Case 20-01141-VFP Doc 70-3 Filed 06/09/20 Entered 06/09/20 17:31:04 Desc
Case 2:01-cv-01079-PAB Document 5 Filed 04/89/20 Page 3 of 18
Exhibit A to Certification    Page 4 of 19

## THE INSURANCE COVERAGE DISPUTE

### The Travelers Policies

8.  In 2016, Travelers sold Protection and Indemnity ("P&I") Policy Number ZOH-81M6730A-16-ND to MER covering the policy period September 17, 2016 to September 17, 2017 ("P&I Policy" or "Policy").

9.  In 2016, Travelers also sold Bumbershoot Policy Number ZOB-15T59501-16-ND to MER covering the policy period September 17, 2016 to September 17, 2017 ("Bumbershoot Policy" or "Excess Policy"). The Travelers P&I Policy and Bumbershoot Policy are hereinafter referred to collectively as "Travelers Policies" or "Policies."

10. Prior to selling the Policies to MER, Travelers understood that MER's business is the recycling of vessels, and that the majority of the recycling work is performed while the vessels are in an afloat condition.

11. The Travelers Policies covered the barge LONE STAR, which MER had purchased at a bankruptcy auction for recycling.

12. Travelers was aware at the time that the Policies incepted that MER was in the process of scrapping the LONE STAR.

13. The insurance broker involved in the placement of the Policies was Arthur J. Gallagher & Co. ("AJG"), which negotiated the Policies with Travelers.

14. The Travelers P&I Policy covered, among other things, wreck removal based on the insurance industry standard terms and conditions set forth in the SP23 form.

15. Among the coverages that MER procured in the Travelers P&I policy were the following:

3

       a. Voluntary Wreck Removal up to $1 million;

       b. Compulsory Wreck Removal up to $1 million; and

       c. Protection from damage caused by third parties, including vandalism and/or sabotage.

16. The Bumbershoot Policy has a $9 million limit of liability and provides "coverage for all sums which [MER] shall become legally obligated to pay for:

    (1) All protection and indemnity risks of whatsoever nature including those covered by the scheduled underlying protection and indemnity insurances . . .;

    (2) . . . and sue and labor arising from any cause whatsoever; . . .

caused by an occurrence happening, . . . during the policy period anywhere in the world . . . ."

17. The limit of liability provision of the Bumbershoot Policy states that Travelers will pay on behalf of MER the Ultimate Net Loss in ex_c_ess of "[t]he amount(s) of the limit(s) set out in the underlying insurances identified in the attached Schedule of Underlying Insurances. . . ."

18. The limit of liability provision of the Bumbershoot Policy indicates that coverage under the Bumbershoot Policy applies, among other things, subject to the terms and conditions of the underlying P&I Policy.

19. The underlying P&I Policy is expressly listed on the Schedule of Underlying Insurances in the Bumbershoot Policy.

20. The Bumbershoot Policy immediately attaches and pays once the limits of liability of the P&I Policy are exhausted.

21. MER timely paid in full the premium for the Travelers Policies.

4

22. Travelers subsequently issued a P&I policy to MER, but the policy was rejected by MER, because it contained erroneous language and it was inconsistent with the terms which had been agreed to and procured earlier.

23. Travelers admitted that it had issued the wrong P&I policy and retracted the initially issued policy.

24. Travelers then issued a second P&I policy to MER, but that policy also contained erroneous terms and conditions and it was similarly rejected by MER.

25. Travelers again admitted that it had issued the wrong P&I policy and retracted the second-issued policy.

26. Travelers promised to issue a corrected P&I Policy containing all of the correct terms and conditions that had originally been agreed to by the parties.

27. Despite that promise, and despite numerous requests from MER, Travelers, to date, has refused to issue the correct P&I Policy.

28. In August 2018, well after MER filed its Complaint in this action, Travelers issued a third version of the P&I policy to MER and, for the first time, issued to MER a version of the Bumbershoot policy.

29. As before, the versions of the P&I policy and the Bumbershoot policy proffered by Travelers contained erroneous terms and conditions and they again were rejected by MER.

30. Travelers' failure to issue the correct Policies, in a timely manner, requires Travelers to provide MER with full coverages that are consistent with MER's understanding of the coverages which it procured from Travelers.

### The Sinking of the LONE STAR

31. MER is engaged in the business of purchasing obsolete, damaged, and out-of-commission vessels for recycling in Puerto Rico. MER, to date, has employed a significant number of Puerto Rico residents in connection with its recycling operations.

32. After MER purchases vessels for its recycling operations, it removes all toxins (if any) and other waste products from the vessels. The vessels' reusable equipment and spares are removed and sold to third parties, and the vessels are subsequently reverse-engineered for disassembly. Large vessel modules are separated from the ship, which are then further reduced into market-sized pieces for sale as various grades and types of scrap metal.

33. MER's processes and procedures adhere to – and in many cases exceed – the strictest health, safety, and environmental regulations found anywhere in the world.

34. While MER is a relatively new company, it has already won recognition by the European Union as the first non-European ship recycling company to meet the European Ship Recycling Regulation 2013.

35. Beginning in approximately January 2015, MER had been negotiating with the government of Puerto Rico for property that would be suitable for MER's operations, which of necessity included an area where ships' "canoes" could be safely removed from the water. The "canoe" of a vessel is the smallest portion of the vessel that can be maintained safely afloat without threatening the structural stability or watertight integrity of the remainder of the vessel.

36. MER eventually received permission to operate at Roosevelt Roads, in Ceiba, Puerto Rico. The property that MER was provided did not include an area where

Case 20-01141-VFP    Doc 70-3    Filed 06/09/20    Entered 06/09/20 17:21:08    Desc
Case 3:18-cv-01709-PAD    Document 123    Filed 06/08/20    Page 7 of 18
Exhibit A to Certification    Page 8 of 19

ships' canoes could be safely removed from the water, but the Puerto Rico government promised that if MER started operations and put a substantial number of people to work, the additional property would be provided in a timely manner.

37.   MER moved its operations to Pier 3 Roosevelt Roads and began operations, ultimately hiring approximately 300 employees, almost all of whom were hired locally, to work at its Roosevelt Roads facility.

38.   MER began its work demolishing the LONE STAR and other vessels. By October 2016 – shortly after the September 17, 2016, inception date of the Travelers Policies – MER had reduced the LONE STAR to the "canoe" stage of recycling.

39.   MER's employees were well aware that a substantial portion of the internal piping work within the LONE STAR had been removed, so that it was critically important to keep all the valves on the vessel closed, or else seawater would enter the vessel.

40.   MER had to stop recycling the LONE STAR, because MER still had not received from the Puerto Rico government the promised parcel of land needed to remove canoes from the water.

41.   MER was advised by the Puerto Rico government at that time that no additional property could be obtained because of the proximity of the November 2016 general election, but that the new government would provide the long-ago promised property after taking office in January 2017.

42.   Following the election, MER met with Puerto Rico government officials on numerous occasions through January 2017. As these discussions continued, MER

indicated that it could not keep nearly 300 employees idle waiting for the government to fulfill its promise to MER past the end of January.

43. When a decision about the property was not forthcoming by the end of January, MER had no choice but to lay off nearly its entire work force while it waited for the government to fulfill its promise.

44. In the meantime, MER's employees regularly checked on the LONE STAR, making sure that it remained safely afloat at the same draft marks each day, and regularly pumped out accumulated rainwater.

45. From October 2016 through April 29, 2017, MER kept the LONE STAR safely afloat and secure.

46. On Sunday, April 30, 2017, MER was notified that an oil slick had been detected near Pier 3, and MER was asked to investigate if it had originated from MER's facility or operations.

47. MER personnel arrived on site shortly thereafter, and quickly determined that the LONE STAR had sunk and that the oil slick was emanating from the LONE STAR.

48. MER immediately enacted its emergency plan, took active steps to control the released oil, and notified appropriate governmental authorities.

49. Following the sinking, a dive on the LONE STAR determined that a sea valve and fire valve were in the open position, and a large wrench was found near those valves, which could have been used to open the valves.

50. MER's surveyors determined that the cause of the sinking was - and only could have been - that the valves were opened.

Case 20-01131-VFP Doc 70-3 Filed 06/09/20 Entered 06/09/20 17:21:04 Desc
Case 1:18-cv-01703-PAB Document 35 Filed 04/89/20 Page 2 of 8
Exhibit A to Certification Page 10 of 19

51. MER's personnel did not open the valves.

### Travelers Knowingly and Intentionally Abandons and Ignores its Policyholder MER.

52. MER immediately notified Travelers concerning the sinking of the LONE STAR. Thereafter, Travelers knowingly and intentionally abandoned its obligations to MER under the Policies, and at various times either sought to delay MER's efforts to remove the wreck or ignored MER's requests for assistance.

53. MER promptly solicited bids for the removal of the wreck. MER continued to keep Travelers apprised of its actions and advised Travelers that MER anticipated that a governmental order to raise the wreck was likely to issue. Travelers dispatched a surveyor to observe the actions being taken by MER and to oversee a dive survey, but for reasons unknown to MER, Travelers' surveyor opted to cancel the dive survey.

54. MER provided Travelers with bids received from Resolve Salvage & Fire (Americas), Inc. ("Resolve"), and Ardent, respectively, to remove the wreck of the LONE STAR. MER recommended to Travelers that the Resolve plan be adopted because (a) Resolve was able to respond more swiftly; and (b) Resolve's proposal was substantially less expensive.

55. Travelers sent a contractor to MER's facility to assess the cost of providing the wreck removal service. The contractor sent by Travelers produced a proposal that was substantially more expensive than both the Resolve and Ardent bids, and was also scheduled to take longer to accomplish.

56. MER again advised Travelers that based on information received, MER anticipated that orders would soon issue from the U.S. Coast Guard and the Puerto Rico

9

Department of Natural and Environmental Resources ("DNER") to remove the wreck. As such, MER encouraged Travelers to adopt the Resolve plan and to proceed to remove the wreck on a voluntary basis. Travelers refused to remove the wreck.

57. As anticipated, the U.S. Coast Guard issued an order concerning the wreck removal of the LONE STAR. A copy of the order was provided to Travelers the same day. The Coast Guard's order required that the threat of pollution caused by the LONE STAR be completely removed.

58. On June 30, 2017, Travelers issued to MER a reservation of rights letter, which was twice amended on August 11, 2017 and August 16, 2017. In its reservation of rights letter, Travelers abandoned MER and stated that "MER should act as a prudent uninsured."

59. The Travelers reservation of rights letter referred to policy language in the Travelers P&I policy that was never incorporated into any policy purportedly issued to MER, because, as discussed above and acknowledged by Travelers, no correct P&I policy was ever issued to MER. In any event, the P&I policy terms and conditions referenced in the reservation of rights letter were incorrect, because communications with the placing broker AJG made it clear that the provisions referenced in the reservation of rights letter were never agreed. MER disputed the reservation of rights letter, but Travelers steadfastly refused to reconsider its position that MER should act as a prudent uninsured.

60. In its reservation of rights letter, Travelers refused to provide coverage for the wreck removal on the purported basis that the Coast Guard order was concerned with pollution, and that MER had separate pollution coverage in place to address such issues.

10

MER rejected that argument on the bases that (i) the only practical way to comply with the Coast Guard order was to remove the wreck of the LONE STAR, because by that time the remaining oil on board had migrated throughout the hull; and (ii) wreck removal was a covered risk under the Travelers Policies. Travelers, however, once again refused to reconsider its position.

61.     The Puerto Rico DNER thereafter issued an order directing that the wreck of the LONE STAR be removed. That order was promptly forwarded to Travelers. The DNER order did not reference pollution at all and simply required that the wreck be removed. Travelers, however, argued that the DNER was an environmental agency, and declined to provide coverage on the purported basis that the pollution coverage should be accessed first.

62.     Travelers incorrectly assumed that the basis for the DNER wreck removal order was related to pollution. MER again refuted this argument on the bases that: (i) the DNER order made no mention whatsoever of pollution; (ii) the DNER was also concerned with the protection of coral; and (iii) the DNER also had concerns regarding the economic damage arising from lack of access to that part of the adjacent pier which was blocked by the wreck. Despite these facts, however, Travelers again refused to reconsider its position, continuing its abandonment of MER and advising MER to act as a prudent uninsured.

63.     Shortly before Hurricane Irma impacted Puerto Rico, the Puerto Rico Local Redevelopment Agency ("LRA"), a government agency, issued MER an order directing that the wreck of the LONE STAR be removed. This order was forwarded to Travelers, but Travelers simply refused to respond. By this time, MER had already

11

contracted with Resolve to remove the wreck, but Resolve was not yet in position to start work due to the weather.

64.     Shortly before Hurricane Maria struck Puerto Rico, the Puerto Rico LRA issued MER a second order directing that the wreck of the LONE STAR be removed. This order was also forwarded to Travelers, but Travelers once again failed to respond.

65.     As set forth above, MER contracted with Resolve to remove the wreck of the LONE STAR.  The wreck has now been successfully removed, and the LONE STAR, together with the equipment that was still on board, is now being recycled for sale as scrap.

66.     In connection with the compulsory removal of the wreck of the LONE STAR, MER incurred costs for initial incident response, ongoing incident response, wreck removal services, security, sue and labor, and loss of equipment.

**Travelers' Coverage Obligations for the Wreck Removal**

67.     The above-referenced costs incurred in connection with the compulsory removal of the wreck of the LONE STAR constitute a claim which falls within the coverage afforded by the Travelers Policies.

68.     MER has complied with all conditions precedent to coverage under the Travelers Policies for the compulsory removal of the wreck of the LONE STAR.

69.     Travelers has no valid basis to deny coverage under the Travelers Policies for the compulsory removal of the wreck of the LONE STAR.

70.     By (i) failing to issue a complete and accurate P&I Policy to MER, and to date not issuing a complete and accurate P&I Policy; (ii) issuing a version of the Bumbershoot policy to MER for the first time only after MER filed its action in this

Court, and to date not issuing a complete and accurate Bumbershoot Policy; (iii) failing to acknowledge in full its coverage obligations to MER; (iv) misrepresenting the terms and conditions of the P&I and the Bumbershoot Policies; (v) abandoning MER and advising MER to act as a "prudent uninsured"; (vi) failing to respond to MER's repeated requests for assistance in connection with various removal orders; and (vii) purporting to shift to MER financial responsibility for the removal of the wreck of the LONE STAR, Travelers has knowingly, intentionally, and deceitfully (a) misrepresented the terms of the insurance that it sold to MER; (b) engaged in unfair and oppressive claims handling tactics; and (c) wrongfully put its own pecuniary interests ahead of the interests of its insured.

## COUNT I - DECLARATORY JUDGMENT

71. MER reiterates the allegations contained in paragraphs 1 through 70 of the Complaint as if fully set forth herein.

72. MER seeks a declaratory judgment, pursuant to 28 U.S.C. §§ 2201-2202, of the rights and legal relations of the parties under the Travelers Policies for all amounts incurred by MER in connection with the compulsory removal of the wreck of the LONE STAR.

73. Specifically, MER seeks a legal determination that Travelers is obligated to pay all of the costs incurred and paid by MER in connection with the wreck of the LONE STAR, including initial incident response, ongoing incident response, wreck removal service, security, sue and labor, and loss of equipment.

## COUNT II - BREACH OF CONTRACT

74. MER reiterates the allegations of paragraphs 1 through 73 of the Complaint as if fully set forth herein.

75.     The Travelers P&I Policy requires Travelers to pay for voluntary or compulsory wreck removal, while the Bumbershoot Policy requires Travelers to pay for compulsory wreck removal.

76.     MER was compelled to remove the wreck of the LONE STAR.

77.     MER has complied with all conditions precedent to coverage under the Travelers Policies.  Alternatively, any condition that has allegedly not been fulfilled by MER is inapplicable because of waiver, estoppel, excuse, futility, or lack of prejudice.

78.     The Travelers Policies contractually obligate Travelers to pay for all of the costs incurred by MER in connection with the wreck of the LONE STAR, including initial incident response, ongoing incident response, wreck removal services, security, sue and labor, and loss of equipment.

79.     Travelers' failure to pay all of the costs associated with the compulsory removal of the wreck of the LONE STAR is in breach of the terms and conditions of the Travelers Policies.

80.     As a direct and proximate result of Travelers' breach of contracts, which is continuing, Travelers has deprived MER of benefits of insurance coverage protection for which MER paid significant premiums.  MER has sustained and continues to sustain significant damages due to Travelers' breach of contract.

### COUNT III – BAD FAITH ("DOLO")

81.     MER reiterates the allegations contained in paragraphs 1 through 80 of the Complaint as if fully set forth herein.

82.     In its knowing, intentional, and deceitful failure to perform its obligations, Travelers has acted in bad faith ("dolo") as set forth in P.R. Laws Ann. tit. 31, § 3018.

83.     Despite the fact that MER, through the broker AJG, negotiated the specific policy language of the Travelers P&I Policy and paid in full the premium due for the Policy, Travelers to date has never issued a correct P&I Policy to MER.  Instead,

14

Travelers has on two occasions issued policies that used incorrect language in order to fit Travelers' coverage-defeating defenses. Travelers subsequently retracted those policies. In its reservation of rights letter concerning wreck removal of the LONE STAR, however, Travelers knowingly, intentionally, and deceitfully misrepresented the P&I Policy language and continued to rely on language that was neither agreed nor incorporated in the Travelers P&I Policy.

84. When the U.S. Coast Guard issued its order concerning wreck removal of the LONE STAR, Travelers refused to honor its coverage obligation for wreck removal, even though voluntary and compulsory wreck removal were covered risks under the Travelers Policies. Travelers claimed that the Coast Guard order was limited to pollution, even though the wreck removal was necessitated by the fact that oil had migrated to the LONE STAR's hull.

85. Travelers continued to refuse to honor its coverage obligations when the Puerto Rico DNER issued an order directing that the wreck of the LONE STAR be removed. The DNER order made no mention whatsoever of pollution, but instead was concerned with the protection of coral and potential economic damage arising from the fact that access to a portion of the adjacent pier was blocked by the wreck. Once again, Travelers abandoned MER and told MER to act as a "prudent uninsured."

86. Travelers completely ignored two subsequent removal orders that MER received from the Puerto Rico LRA, both of which directed that the wreck of the LONE STAR be removed. Having been abandoned by Travelers, MER subsequently took the reasonable steps necessary to remove the wreck of the LONE STAR.

87. Travelers has committed numerous knowing, intentional, and deceitful acts and omissions in an effort to avoid its coverage obligations. Travelers has delayed the issuance of a correct P&I Policy to MER, and to date has not issued a correct Policy, in an effort to avoid its coverage responsibilities for the removal of the wreck of the

15

LONE STAR.  After the wreck of the LONE STAR, Travelers misrepresented to MER the coverage available under the Travelers P&I Policy.  Travelers then abandoned MER and told MER to conduct itself as a "prudent uninsured."  Travelers subsequently refused to respond to MER's requests for assistance concerning various removal orders concerning the wreck of the LONE STAR, intending thereby to shift to MER financial responsibility for the wreck of the LONE STAR.

88.    Travelers never issued to MER a correct copy of the Bumbershoot Policy.  It was after MER filed its action in this Court that Travelers provided MER, for the first time, with a version of the Bumbershoot policy in August 2018, but that version also contained erroneous terms and conditions.

89.    Through the foregoing knowing, intentional, and deceitful acts and omissions, including delays in policy issuance, misrepresentations of the coverage available to MER, abandonment of MER, refusals to respond to MER, and related actions, Travelers has engaged in unfair and oppressive claims handling practices and put its own pecuniary interests ahead of the interests of its insureds in order to avoid its coverage obligations and to extract a financial outcome more favorable to Travelers.  Travelers' knowing, intentional, and deceitful acts and omissions in connection with the Policies for which MER paid substantial premiums constitute bad faith ("dolo") as set forth in P.R. Laws Ann. tit. 31, § 3018.

**PRAYER FOR RELIEF**

**WHEREFORE**, for the claims asserted in Counts I, II, and III of this Complaint, MER seeks judgment against Travelers as follows:

(a)    Judgment under 28 U.S.C. §§ 2201-2202 declaring that Travelers is obligated under the Travelers Policies to pay in full all of the costs incurred by MER in connection with the compulsory removal of the wreck of the LONE STAR, including initial incident response, ongoing incident

            response, wreck removal services, security, sue and labor, and loss of equipment;

(b)    Judgment against Travelers that it has breached its Policies by its failure to fulfill its obligations to pay in full all of the costs incurred by MER in connection with the compulsory removal of the wreck of the LONE STAR, including initial incident response, ongoing incident response, wreck removal services, security, sue and labor, and loss of equipment; and that Travelers is obligated to pay MER compensatory damages in an amount to be determined at trial, but not less than $4,989,426;

(c)    Judgment against Travelers under P.R. Laws Ann. tit. 31, § 3018 in an amount sufficient to compensate MER for all damages proximately caused by Travelers' bad faith ("dolo") complained of herein;

(d)    Pre- and post-judgment interest in an amount allowed by law;

(e)    Attorneys' fees, costs, and expenses incurred in the prosecution of this action;

(f)    Punitive damages; and

(g)    Such other and further relief as the Court may deem proper.

## JURY DEMAND

MER hereby demands a jury trial on all issues so triable.

**RESPECTFULLY SUBMITTED,**

In the city of San Juan, Puerto Rico, this 13th day of September 2018.



P. O. Box 9023596
San Juan, Puerto Rico 00902-3596
☎ (787) 977-5050 🖷 (787) 977-5090

S/KENNETH C. SURIA
**Kenneth C. Suria**
Email: kcsuria@estrellallc.com
USDC-PR 213302

**S/PETER L. TRACEY**
**Peter L. Tracey (admitted *pro hac vice*)**
**Koorosh Talieh**
**PERKINS COIE LLP**
700 13th Street, NW
Washington, DC 2005-3960
Tel. No.: (202) 654-6200
Fax.: No. (202) 654-6211
Email: Ptracey@perkinscoie.com

*Attorneys for Plaintiffs*

141100875.3